UNITED STATES DISTRICT COURT
MIDDLE DISTRICT OF FLORIDA
TAMPA DIVISION

**DONALD J. HINSON,**

    **Plaintiff,**

**v.**                                                         Case No: 8:17-cv-2039-T-27SPF

**GRADY JUDD, in his official
capacity as Sheriff of the Polk County
Sheriff's Office,** *et al.***,**

    **Defendants.**
_____/

## ORDER

**BEFORE THE COURT** is Defendant Sheriff Grady Judd's Amended Dispositive Motion for Summary Judgment (Dkt. 66), and Plaintiff's response (Dkt. 71). Upon consideration, Defendant's motion (Dkt. 66) is **GRANTED**.

### I.    BACKGROUND AND UNDISPUTED MATERIAL FACTS[1]

Donald J. Hinson brought this action against Grady Judd in his official capacity as Sheriff of Polk County, alleging violations of his civil rights under 42 U.S.C. §§ 1983 and 1988 and the Fourteenth Amendment. His allegations arise from an incident in the Polk County Jail, when he was attacked by another detainee. He brings two claims, Policy Liability Other Failures (Count IV), and Negligence (Count V).

On August 25, 2013, Hinson surrendered to the custody of the Polk County Sheriff's Office ("PCSO") as a pretrial detainee (Dkt. 59 ¶¶ 12, 15). He was placed in holding cell number four with

---

[1] Plaintiff does not expressly contradict Defendant's factual assertions or provide a statement of undisputed facts.

1

another detainee, William Edwards (Id. ¶ 21).[2] Both were being preliminarily processed and booked prior to transfer to the South County Jail, where a full assessment and classification would be completed. Hinson had no prior interaction or relationship with Edwards before the event giving rise to this lawsuit (Id. ¶ 23). Notwithstanding, Edwards, unexpectedly and without provocation, struck Hinson on the right side of his face. (Id. ¶¶ 12-13). The attack resulted in injuries to Hinson, including facial bone fractures and closed head trauma. (Id. ¶ 54).

When Edwards was placed in holding cell number four, the Polk County Jail had no system that would identify a new detainee's propensity to harm others. Rather, the practice was to rely on the charges the detainee was being booked on, the behavior of the detainee while at book-in, and any known, passed-on information about the detainee that would call for a need to separate the detainee from others. (Dkt. 55, Deputy Swenson Dep., at p. 8:12-25, 9:1-11, 22:8-25, 23:1-22); (Dkt. 65, Ex. 2, Department of Detention Directive 2.2, C.1.d.13); (Dkt. 65, Chief Allen Dep., at pp. 44:22-25, 45:1-10, 53:1-6); (Dkt. 54, Sgt. Rodriguez Dep., at p. 45:8-19).

## II. STANDARD

Defendant moves for summary judgment, contending that "no genuine issue of material fact exists in the record" to support Plaintiff's claims. (Dkt. 66 at p. 2). Summary judgment is appropriate where "there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). "A genuine factual dispute exists only if a reasonable fact-finder 'could find by a preponderance of the evidence that the [non-movant] is entitled to a verdict.'" *Kernel Records Oy v. Mosley*, 694 F.3d 1294, 1300 (11th Cir. 2012) (quoting *Anderson v. Liberty*

---

[2] Edwards, a registered felon, was in custody for violating a non-expiring injunction for protection against repeat violence. (Id. ¶ 16).

*Lobby, Inc.*, 477 U.S. 242, 252 (1986)). A fact is material if it may affect the outcome of the suit under governing law. *Allen v. Tyson Foods, Inc.*, 121 F.3d 642, 646 (11th Cir. 1997). All facts are viewed and all reasonable inferences are drawn in the light most favorable to the non-moving party. *See Scott v. Harris*, 550 U.S. 372, 380 (2007).

The moving party bears the initial burden of showing that there are no genuine disputes of material fact. *Hickson Corp. v. N. Crossarm Co., Inc.*, 357 F.3d 1256, 1260 (11th Cir. 2004) (citing *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986)). Once the moving party demonstrates the absence of a genuine issue of material fact, the non-moving party must go beyond the pleadings through the use of affidavits, depositions, answers to interrogatories, and admissions on file to designate facts showing a genuine issue for trial. *See Celotex Corp.*, 477 U.S. at 324. The Court will not weigh the evidence or make findings of fact. *Morrison v. Amway Corp.*, 323 F.3d 920, 924 (11th Cir. 2003). Rather, the Court's role is limited to deciding whether there is sufficient evidence upon which a reasonable juror could find for the non-moving party. *See id.*

## III. DISCUSSION

### *Count IV: 42 U.S.C. § 1983 - Policy Liability*

In Count IV, Hinson brings a claim under 42 U.S.C. § 1983 against Sheriff Judd in his official capacity as Sheriff of Polk County. (Dkt. 59 ¶ 9). This claim is functionally against the Polk County Sheriff's Office. *See Kentucky v. Graham*, 473 U.S. 159, 166 (1985); *Cook ex rel. Estate of Tessier v. Sheriff of Monroe Cnty., Fla.*, 402 F.3d 1092, 1115 (11th Cir. 2005). Relevant to this claim, governmental entities may be liable for constitutional violations resulting from the execution of a policy or custom of the governmental entity. *See Monell v. Dep't of Social Servs. of City of N.Y.*, 436 U.S. 658, 694 (1978).

To impose § 1983 liability on Judd in his official capacity, Hinson must demonstrate that Judd had an official policy or custom that was the "moving force" behind the constitutional violation. *Id.* The policy or custom must be a decision that is officially adopted by the governmental entity, or "created by an official of such rank that he or she could be said to be acting on behalf of the municipality." *Cooper v. Dillon*, 403 F.3d 1208, 1221 (11th Cir. 2005) (citation and internal quotation marks omitted). The practice must be so permanent and well settled as to constitute a "custom or usage" with the force of law, and proof of a single incident of unconstitutional activity is not sufficient to impose liability, unless that proof shows that it was caused by an existing, unconstitutional policy attributed to the policy maker. *Id.*; *Craig v. Floyd Cty*, 643 F.3d 1306, 1310 (11th Cir. 2011). And liability attaches only where a deliberate choice to follow a course of action is made from alternatives by the official responsible for establishing final policy. *Pembaur v. City of Cincinnati*, 475 U.S. 469, 483-84 (1986).

**Plaintiff's Allegations**

Hinson alleges that Sheriff Judd failed to provide a safe environment, failed to protect him from serious risk of harm, and "refused to take reasonable measures to protect [him] and other inmates from harm despite knowing that [his] assailant and others like him posed a substantial risk of serious harm." (Dkt. 59 ¶ 9). He faults Judd for not having a "red flag" system in place to segregate certain detainees during the book-in process, and failing to protect pretrial detainees from violent detainees placed in the holding cell together. He alleges that Judd promoted and maintained a policy that commingled violent and non-violent detainees during booking, and that the failure to separate them was the moving force behind the attack on him. (Dkt. 59 ¶¶ 2, 59-60). Hinson's § 1983 claim is based on a failure to train the detention deputies and an unconstitutional policy or custom.

4

*See* (Dkt. 66 at p. 9; Dkt. 71 at pp. 2, 4).

### *i. Failure to Train*

Hinson alleges that Judd "encouraged, tolerated, ratified and has been deliberately indifferent to . . . the need for more or different training . . . in the area of [] Detention deputy and supervisor duties and responsibilities to ensure proper classification at booking to ensure pretrial detainees have a safe environment, including, but not limited to: [] Failure to train detention deputies and supervisors to properly disclose, communicate and act upon receipt of known mentally ill, violent and predatory inmates." (Dkt. 59 ¶ 61).

A § 1983 failure to train claim will ordinarily rest on a pattern of constitutional violations which would make the need for more training so obvious, and the inadequacy of training so likely to result in the violation of constitutional rights, that the policy maker can reasonably be said to have been deliberately indifferent to that need. *City of Canton v. Harris*, 489 U.S. 378, 391 (1989). During the Pretrial Conference, counsel for Hinson confirmed that the § 1983 claim relies on a pattern of constitutional violations.

Sheriff Judd moves for summary judgment, contending that the record includes no facts "that point to a pattern of constitutional violations that have resulted from Sheriff Judd's alleged 'failure to train.'" (Dkt. 66 at p. 12). Hinson responds that "detainee violence in cell four was an obvious consequence of a training that did not require examination of prior records kept by the sheriff's office itself." (Dkt. 71 at p. 4). Judd's arguments are persuasive. The record evidence does not demonstrate a pattern of constitutional violations resulting from a failure to train. And without notice of deficient training, Judd could not have been deliberately indifferent. *See Connick v. Thompson*, 563 U.S. 51, 61 (2011).

As noted, § 1983 liability is limited to circumstances where "official policy" causes a constitutional violation. *Gold v. City of Miami*, 151 F.3d 1346, 1350 (11th Cir. 1998). Hinson must therefore establish that inadequate training was a policy or custom which caused the claimed constitutional violation. *Id*. (citing *Canton*, 489 U.S. at 389-91). And since a governmental entity will "rarely" have an officially adopted policy of permitting a constitutional violation, he must show that Judd had "a custom or practice of permitting [the violation] and that [his] custom or practice is 'the moving force behind the constitutional violation.'" *Brown v. Neumann*, 188 F.3d 1289, 1290 (11th Cir. 1999).

A failure to provide adequate training can constitute a policy or custom if the deficiency evidences a "'deliberate indifference' as to its known or obvious consequences." *Bd. of Cty. Comm'rs of Bryan Cty., Okl. v. Brown*, 520 U.S. 397, 407 (1997). The policy or custom may be established by a showing that the failure to train reflects a "deliberate or conscious choice" on the part of Sheriff Judd. *Id.* To avoid summary judgment on this claim, Hinson "must present some evidence that [Sheriff Judd] knew of a need to train . . . in a particular area and [he] made a deliberate choice not to take any action." *Gold*, 151 F.3d at 1350; *Am. Fed'n of Labor & Cong. of Indus. Orgs. v. City of Miami*, 637 F.3d 1178, 1188-89 (11th Cir. 2011). He has not done so.

In *Am. Fed'n of Labor & Cong. of Indus. Orgs.*, 637 F.3d 1178, this Circuit summarized the difficulty in prevailing on a failure to train claim:

> Establishing notice of a need to train or supervise is difficult. A plaintiff may demonstrate notice by showing a "widespread pattern of prior abuse" or even a single earlier constitutional violation. But a plaintiff must also demonstrate that constitutional violations were likely to recur without training. In some cases, the need for training is so obvious that deliberate indifference can be established even without an earlier violation or pattern of abuse. Still, it must have been obvious that the municipality's failure to train or supervise its employees would result in a

6

constitutional violation. In addition to notice, a plaintiff must also establish that the city "made a deliberate choice" not to train its employees.

*Id.* at 1189 (internal citations omitted).

Hinson contends that Sheriff Judd was deliberately indifferent to the need for adequate training "to ensure proper classification at booking to ensure pretrial detainees have a safe environment, including, but not limited to: failure to train detention deputies and supervisors to properly disclose, communicate and act upon receipt of known mentally ill, violent and predatory inmates." (Dkt. 59 ¶ 61). Essentially, he alleges that Judd failed to train his detention deputies to ensure a safe environment for pretrial detainees[3] and "screen" or separate "known mentally ill, violent and predatory inmates" from nonviolent detainees. (Id. ¶¶ 59-61).

Hinson maintains that Judd was on notice of the need to train and was deliberately indifferent to that need based on the existence of a widespread pattern of abuse. However, he has not submitted any evidence of a widespread pattern of abuse to support this contention. *See Rocker v. City of Ocala*, 355 F. App'x 312, 314 (11th Cir. 2009) ("The need for training is not plainly obvious unless

---

[3] While the Eighth Amendment prohibits "cruel and unusual punishments," "[i]t is not . . . every injury suffered by one prisoner at the hands of another that translates into constitutional liability for prison officials responsible for the victim's safety." *Farmer v. Brennan*, 511 U.S. 825, 834 (1994) (citation omitted); *see also Zatler v. Wainwright*, 802 F.2d 397, 400 (11th Cir. 1986) ("It is well settled that a prison inmate has a constitutional right to be protected from the constant threat of violence and from physical assault by other inmates. However, '[t]his does not mean that the constitutional rights of inmates are violated every time a prisoner is injured. It would not be reasonable to impose such an absolute and clearly unworkable responsibility on prison officials.'" (citations omitted)).

Recently, in *Marbury v. Warden*, --- F.3d ---, No. 17-12589, 2019 WL 4062675 (11th Cir. August 29, 2019), the Eleventh Circuit affirmed the dismissal of a prisoner's § 1983 claims where the plaintiff was assaulted by another inmate. The Court conducted a deliberate indifference analysis as applied to failure-to-protect claims, and held that plaintiff failed to "demonstrate[] a genuine factual issue as to whether the defendants were deliberately indifferent to a substantial risk of serious harm . . . ."

Despite the similarities between Hinson and Marbury in that both were in some form of custody and were assaulted by fellow inmates, the analysis in the cases differs. In *Marbury*, the decision turned on qualified immunity with respect to § 1983 claims brought against defendants in their individual capacity. Here, Plaintiff's claims are brought against Sheriff Judd in his official capacity, based on policy liability and negligence.

there is evidence of a history of widespread prior abuse.") (citation and internal quotation marks omitted). More specifically, he does not present any evidence of prior constitutional violations arising from a failure to train staff in the areas of pretrial detainee safety that would have placed Judd on notice of the need for training.[4]

Hinson attempts to establish notice of the need to train by relying on examples[5] of Edwards' "dangerous acts" (Dkt. 71 at pp. 13-14) and the opinions of his expert, Donald Leach, to show that alternative "acceptable correctional practices for identifying the propensity for violent behavior" could have been put in place. (Id. at pp. 3-4). He identifies various "dangerous acts" attributed to Edwards while in custody, including 12 instances in which he either fought with or attacked other inmates, once in the South County Jail in Frostproof, and his criminal history, which includes arrests for battery, killing an unborn child, robbery with a firearm, drug possession, and his mental health history. (Id. at pp. 13-14). He contends that "[t]here [sic] mere number of records should have put

---

[4] In support of his summary judgment motion, Judd relies on the testimony of Michael Allen, Chief of the Polk County Sheriff's Office Department of Detention. (Dkt. 66 at p. 16). When asked why there is no specific directive about who is eligible for placement in cell four, Chief Allen responded,

> It seems like in terms of processing people through our booking facilities, we rarely have incidents in these holding cells where it is a concern of putting people together.
>
> Not to say that we don't have fights, because you put two people in there and somebody doesn't like somebody, well, that happens. But I think if you looked at overall, the number that we run through there and the incidents that we have, I don't see a pattern that would cause us to say that we have to have a policy that says only these should be allowed or these shouldn't be allowed.

(Dkt. 65 at pp. 67:19-25, 68:1-8).

[5] In his response to Defendant's motion, Plaintiff notes that as a result of a public records response, he was provided with "441 pages of information with some examples of the bevy of data that clearly shows Edwards was not fit for the cell 4 environment." (Dkt. 71 at p. 13). Plaintiff asserts that the examples he provides in his opposition are not limited to what he identifies from these records. (Id.). In opposing summary judgment, however, he must "point to the specific portions of the proffered material which create[s] a material issue of fact." *Restigouche, Inc. v. Town of Jupiter*, 59 F.3d 1208, 1213 n.5 (11th Cir. 1995). The Court is not required to "search the record" for an unidentified issue of material fact to support a claim. *Id.*; *Reese v. Herbert*, 527 F.3d 1253, 1268 (11th Cir.), *reh. den.*, 285 F. App'x 743 (11th Cir. 2008).

the Detention Deputies on notice of the severe danger Edwards presented." (Dkt. 71 at p. 13).

But this evidence does not establish a widespread pattern of constitutional violations resulting from a failure to train that would have put Judd on notice of a need to train. Indeed, it is undisputed that when Hinson was attacked, the detention deputies had no knowledge or information that Edwards had a history of or propensity for violence. (Dkt. 52, Donald Leach Dep., at pp. 22:4-23; 29:2-25, 30:1-25, 34:9-25, and 41:9-16). Accordingly, this evidence does not support Plaintiff's failure to train theory. *See Connick*, 563 U.S. at 62 ("A pattern of similar constitutional violations by untrained employees is 'ordinarily necessary' to demonstrate deliberate indifference for purposes of failure to train.").[6] And without notice of deficient training, Judd could not have been deliberately indifferent.

In the absence of a pattern of unconstitutional violations, § 1983 liability based on inadequate training may only be established "if the likelihood for constitutional violation is so high that the need for training would be obvious." *Lewis v. City of West Palm Beach*, 561 F.3d 1288, 1293 (11th Cir. 2009) (citing *Gold*, 151 F.3d at 1351-52). This exception is found in a footnote in *Canton*, 489 U.S. 378, where the Supreme Court noted a hypothetical scenario in which a police agency provides firearms to its police officers, and the unconstitutional use of deadly force might be a "highly predictable consequence" of failing to train officers in the use of deadly force. *Id.* at 390 n.10.

Judd contends this exception is not warranted to Hinson's claim of failure to train. (Dkt. 66 at p. 11). He argues that "the book-in process does not present the 'obvious' need for training in the

---

[6] Plaintiff was on notice of the necessity to bring forth evidence of a pattern of constitutional violations. The order dismissing Plaintiff's First Amended Complaint included a finding that "[t]here [were] simply no facts alleged in the Amended Complaint that identify a pattern of constitutional violations of which Sheriff Judd was both aware of and deliberately indifferent to. (Dkt. 58 at p. 6).

9

immediate classification and segregation of detainees that the use of deadly force" does. (Id.). In response, Hinson argues that "[t]he Court should not hamstring the doctrine by limiting it to only *Canton* facts." (Dkt. 71 at p. 15). Rather, "a 'fitness screening' for placement in the general booking population should have occurred before one [could] cohabitate with misdemeanor pretrial detainees like Mr. Hinson."[7] (Id.).

Based on these competing contentions, the issue is whether it can be said that "the likelihood for constitutional violation is so high that the need for training would be obvious" in the classification and segregation of pretrial detainees. *Lewis*, 561 F.3d 1288. I think not. Edwards' conduct does not indicate a "highly predictable consequence" of failing to train detention deputies.

Hinson contends that violence among detainees was "an obvious consequence of training that did not require examination of prior behavior records kept by the sheriff's office itself" and that "booking detention deputies were not trained to identify an inmates' propensity for violence [and] were not trained to assess the potential danger to fellow detainees that known dangerous inmates posed." (Dkt. 71 at pp. 3, 4). According to Hinson, "[g]iven the staggering number of assaults this specific assailant was able to commit in the Polk County Jail, and given the fact that he went on to commit assault post-his attack of Plaintiff, it is reasonable to infer the lack of training and policies would lead to the constitutional violation and serious injury." (Id. at p. 15).

These contentions, and more importantly, the record evidence, however, are insufficient to implicate the narrow circumstance noted in *Canton*. Hinson's assertion that Judd was on notice of

---

[7] Plaintiff cites to *Farmer v. Brennan*, 511 U.S. 825 (1994) under a section titled "Deliberate Indifference." *Farmer*, however, is inapplicable as it deals with § 1983 liability based on a failure to protect, rather than policy liability. Plaintiff's claims for failure to protect were voluntarily dismissed when he amended his complaint. See (Dkt. 59 at p. 12 n.2). Notwithstanding, the deliberate indifference standard in *Farmer* is subjective, meaning that prison officials "must both be aware of facts from which the inference could be drawn that a substantial risk of serious harm exists, and [they] must also draw the inference." *Farmer*, 511 U.S. at 838.

the need to train and was deliberately indifferent to that need is based only on Edwards' pattern of behavior. (Dkt. 71 at p. 13). He expressly contends that "the pattern of Edward's (sic) behavior triggers the need for obvious protection." (Id.). But Edwards' history of violent conduct and criminal history does not demonstrate that detainee violence was a "highly predictable consequence" of failing to train detention deputies, such that Judd was deliberately indifferent to the rights of detainees. Specifically, the record evidence does not demonstrate, or even give rise to material factual dispute, that the likelihood of a constitutional violation was so predictable that Judd's failure to train the deputies reflects a "deliberate or conscious choice."

The opinion of Plaintiff's expert, Donald Leach, does not give rise to a material factual dispute as to whether Sheriff Judd was on notice of a need to train or deliberately indifferent to its consequences. *See Buckler v. Israel*, 680 F. App'x 831, 835-36 (11th Cir. 2017); *Campbell v. Sikes*, 169 F.3d 1353, 1370-71 (11th Cir. 1999); *Evers v. Gen. Motors Corp.*, 770 F.2d 984, 986 (11th Cir. 1985) (quoting *Merit Motors, Inc. v. Chrysler Corp.*, 569 F.2d 666, 672-73 (D.C. Cir. 1977)) ("Rule 703 was intended to broaden the acceptable bases of expert opinion, but it was not intended, as appellants seem to argue, to make summary judgment impossible whenever a party has produced an expert to support its position."); *see also Am. Key Corp. v. Cole Nat'l Corp.*, 762 F.2d 1569 (11th Cir. 1985) (finding summary judgment for defendant proper and no error in assigning "little weight" to plaintiff's expert because his affidavits did not create a material issue of disputed fact).

To support his contention that "detainee violence in cell four was an obvious consequence of a training that did not require examination of prior records kept by the sheriff's office itself," Plaintiff relies on Leach's opinion:

> The acceptable correctional practice for identifying the propensity for violent behavior is to examine the following information about the inmate: alert or flag entered as a result of past behaviors; the criminal case history; the institutional behavior history; all current behaviors; and, all relevant need assessments, specifically any relevant mental health need assessment that might convey a propensity for violence associated with the individual's mental health status.

(Id. at p. 3) (citing (Dkt. 52, Donald Leach Dep., Ex. 2, Expert Report, at p. 27)).

That more could have been done to identify a detainee like Edwards' propensity to assault fellow detainees does not give rise to a material issue of fact as to whether Sheriff Judd's failure to train amounts to deliberate indifference, since mere negligence does not support liability under § 1983. *Daniels v. Williams*, 474 U.S. 327, 664-65 (1986); *Keith v. DeKalb Cty*, 749 F.3d 1034 (11th Cir. 2014) ("While there may have been ways in which the Sheriff . . . could have improved the training of officers, the deliberate indifference standard requires a showing of more than gross negligence.").

In sum, there is no evidence of a pattern of constitutional violations that would have put Sheriff Judd on notice of an existing need for improved policies and training for detention deputies, or for a system to "red flag" a detainee. Hinson's § 1983 failure to train claim therefore fails. And, as noted, even if the record evidence supports his contention that Sheriff Judd was on notice of a need to train his detention deputies, he must establish that Judd "made a choice not to do so." *Am. Fed'n of Labor & Cong. of Indus. Orgs.*, 637 F.3d at 1189 (citing *Gold*, 151 F.3d at 1350) ("To establish . . . 'deliberate indifference,' a plaintiff must present some evidence that the municipality knew of a need to train and/or supervise in a particular area *and* the municipality made a deliberate choice not to take any action.") (emphasis added). Plaintiff does not present any such evidence.

*ii. Unconstitutional Policy/Procedure*

Hinson contends that Sheriff Judd acted pursuant to established policies which resulted in a violation of his constitutional rights. He cites the failure to separate inmates, despite a known propensity for violence, the failure to implement a computer system to track known violent offenders and to train staff to screen inmates using historical data from the jail, and the failure to protect pretrial detainees from violence from other detainees (Dkt. 59 ¶¶ 18, 20, 36-37, 59-61).[8]

Sheriff Judd contends that summary judgment is appropriate on this claim because there is no evidence of an official custom or established policy which would support a "failure to protect" theory, or that Judd was deliberately indifferent to the need for such policies. In response, Hinson contends that "[u]ltimately, not having anything available regarding an individual's past assaultive behavior on other inmates while in custody at book-in at the Polk County Jail, was a violation of the United States Constitution" and "[u]ltimately, the Sheriff promotes constitutional violations through inaction." (Dkt. 71 at pp. 7, 11). Essentially, he argues that the absence of policies to identify detainees with propensities for violence and to separate them from other detainees amounts to an unconstitutional policy.

Liability may be imposed because of the absence of a policy that establishes appropriate procedures to ensure that a person's constitutional rights are not violated. *See Rivas v. Freeman*, 940 F.2d 1491, 1495 (11th Cir. 1991). In that circumstance, a plaintiff must show that the "'policy of

---

[8] As noted, to impose liability on Judd in his official capacity, Plaintiff must show that the deprivation of a constitutional right resulted from: "(1) an action taken or policy made by an official responsible for making final policy in that area of the [Sheriff's] business; or (2) a practice or custom that is so pervasive, as to be the functional equivalent of a policy adopted by the final policymaker." *Church v. City of Huntsville*, 30 F.3d 1332, 1343 (11th Cir. 1994). "[T]o demonstrate a policy or custom, it is generally necessary to show a persistent and wide-spread practice," as opposed to a single incident. *McDowell v. Brown*, 392 F.3d 1283, 1290 (11th Cir. 2004) (quotation omitted).

inaction' is the functional equivalent of a decision by the city itself to violate the constitution." *Canton*, 489 U.S. at 394-95 (O'Connor, J., concurring). Accordingly, to avoid summary judgment, Hinson must demonstrate that Judd's failure to maintain a policy of separating dangerous detainees amounted to deliberate indifference to its known or obvious consequences, and a conscious decision not to take action. *Bd. of Cty. Comm'rs of Bryan Cty.*, 520 U.S. at 407.

Hinson has not shown deliberate indifference on Judd's part, or an issue of material fact that would prevent summary judgment on Judd's behalf. He acknowledges that the Sheriff has policies through the Department of Detention Directives for administrative protective custody for detainees and utilizes certain cells for protective custody. (Dkt. 65, Ex.2, Department of Detention Directive 2.2, C.1.d.13); (Dkt. 71 at p. 8); (Dkt. 55, Swenson Dep., at p. 8:12-25, p. 9:1-11). Detainees are separated based on the charges they face, their appearance and behavior during and while in book-in (Dkt. 65, Chief Allen Dep., at p. 53:1-6), and whether they need medical care (Id. at pp. 44:22-25, 45:1-10; Dkt. 54, Rodriguez Dep., at p. 45:8-19; Dkt. 55, Swenson Dep., at pp. 22:8-25, 23:1-22). He essentially contends that these policies were not sufficient to safeguard his safety. But as discussed, he has not provided evidence of widespread detainee violence which would have indicated that the likelihood of a constitutional violation was so obvious that the failure to have a policy in place reflected a deliberate or conscious choice. Without evidence establishing that the absence of policies resulted in deliberate indifference to his constitutional rights, this claim fails. *See McDowell*, 392 F.3d at 1291.

***Count V: Negligence Claim against Sheriff Judd in his Official Capacity***

In Count V, Plaintiff alleges a Florida negligence claim against Judd in his official capacity. (Dkt. 59 ¶¶ 64-72). He contends Judd is vicariously liable for the injuries caused by the acts or

omissions of the deputies "acting within the scope of their employment and without bad faith, malicious intent or in a manner exhibiting wanton and willful disregard" of his rights. (Id. ¶ 67). Judd argues that Count V must be dismissed because Hinson's negligence claim is barred by sovereign immunity. (Dkt. 66 at pp. 19-22).

Sovereign immunity may bar an action for negligence. *Cook ex rel. Estate of Tessier v. Sheriff of Monroe Cty.*, 402 F.3d 1092, 1117 (11th Cir. 2005) (citing *Pollock v. Fla. Dep't of Highway Patrol*, 882 So. 2d 928, 933 (Fla. 2004)). "[B]asic judgmental or discretionary governmental functions are immune from legal action, whereas operational acts are not protected by sovereign immunity." *Id.* A discretionary function "is one in which the governmental act in question involved an exercise of executive or legislative power such that, for the court to intervene . . . it would inappropriately entangle itself in fundamental questions of policy and planning were it to entertain the plaintiff's tort claim." *Id.* at 1117-18 (citing *Henderson v. Bowden*, 737 So. 2d 532, 538 (Fla. 1999)). "An 'operational' function, on the other hand, is one not necessary to or inherent in policy or planning, that merely reflects a secondary decision as to how those policies or plans will be implemented." *Id.* at 1118.

In Florida, the "operation and maintenance" of prisons is a discretionary function of the sheriff, an independent officer under the Florida Constitution. *See White v. Palm Beach Cty.*, 404 So. 2d 123, 125 (Fla. 4th DCA 1981). One function of operating and maintaining prisons is the classification and placement of inmates. *Davis v. State of Fla., Dep't of Corr.*, 460 So. 2d 452, 453 (Fla. 1st DCA 1984).[9] Nevertheless, the Florida Supreme Court has held that assigning pretrial

---

[9] *See also Dunagan v. Seely*, 533 So. 2d 867, 868 (Fla. 1st DCA 1988) ("[W]hile the making of the policies and procedures for classifying, supervising and maintaining inmates is a discretionary function to which sovereign immunity does attach, the allegation of injury due to the failure to follow those policies is actionable because that

detainees to particular locations in a detention facility where they are foreseeably exposed to danger can be an operational level act not protected by sovereign immunity. *See Dep't of Health & Rehab. Servs. v. Whaley*, 574 So. 2d 100, 104 (Fla. 1991) (holding that the assignment of juveniles to a particular room or location in a detention facility during intake is an operational function not protected by sovereign immunity).

Judd's entitlement to sovereign immunity depends on whether Plaintiff's claims are based on policies concerning general classification and placement of inmates and detainees *or* on the specific assignment of Plaintiff to a location in the Polk County jail where he foreseeably faced danger from Edwards. In his Second Amended Complaint, Plaintiff attempts to plead a plausible claim by alleging that "the assignment of Plaintiff, a pretrial detainee, to cell four in the booking area where there was a foreseeable exposure to danger is an operational act not protected by sovereign immunity." (Dkt. 59 ¶ 70). He repeats this contention in his Response to Judd's motion, but adds that "the Sheriff made a decision that policies regarding screening inmates by their available history were not necessary or required for the safe operation of the booking area." (Dkt. 71 at pp. 18-19).

Even considering the evidence in the light most favorable to Hinson, he was placed in cell number four in accordance with the standard practice at the jail for pretrial detainees, and there is not evidence that he foreseeably faced danger from that placement. His placement in cell number four therefore necessarily reflects a discretionary policy decision concerning the classification and placement of pretrial detainees in general, not from his specific placement in holding cell number four. (*See* Dkt. 59 ¶ 69(a)-(f)).[10] Accordingly, his claim for negligence for "failing to develop even a rudimentary

---

failure was an operational function and is not protected by the sovereign immunity doctrine.").

[10] For example, Plaintiff alleges: "The constitutional deficiency within the booking area is that the processing regime has no standardized protocol to determine the threat risks of a detainee. Once processed through housing classifications, inmates can have special designations that include security codes. . . . The booking process

system to flag and alert detention deputies processing people through booking about dangerous detainees" is barred by sovereign immunity and due to be dismissed. *See McCreary v. Brevard Cty.*, Case No. 609-CV-1394, 2010 WL 2509617, at *10 (M.D. Fla. June 18, 2010), *on reconsideration*, No. 6:09-CV-1394, 2010 WL 2836709 (M.D. Fla. July 19, 2010), *and aff'd sub nom. McCreary v. Parker*, 456 F. App'x 790 (11th Cir. 2012) ("Plaintiff's allegation that [defendants] are liable for 'failing to properly require the classification of inmates,' . . . concerns the failure to implement, not follow, a policy for the classification of inmates. Thus, pursuant to *Davis* and *Dunagan*, Plaintiff's wrongful death claim against [defendants] for 'failing to properly require the classification of inmates' is barred by sovereign immunity and should be dismissed.").

## CONCLUSION

The undisputed material facts of record do not support a finding of liability against Sheriff Judd on any of the theories of policy liability or negligence Hinson raises. Accordingly, Defendant Sheriff Grady Judd's Amended Dispositive Motion for Summary Judgment (Dkt. 66), is **GRANTED**. The Clerk is directed to enter judgment in favor of the Defendant, **CLOSE** the file, and deny any pending motions as moot.

**DONE AND ORDERED** this 11th day of September, 2019.

*/s/ James D. Whittemore*

**JAMES D. WHITTEMORE**
**United States District Judge**

Copies to: Counsel of Record

---

contains no such red flag system." (Dkt. 59 ¶ 47). And Defendant Judd "breached his official capacity duty of care by failing to develop even a rudimentary system to flag and alert detention deputies processing people through booking about dangerous detainees. Defendant Judd failed to implement any policies that required an alert be placed on the files of former detainees who had been violent, mentally ill or committed crimes while in custody at the Polk County jail." (Id. ¶ 69).